# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN

## MOTION TO WITHDRAW

| | |
|---|---|
| **CHRISTOPHER MCNEAL**;<br>**HANNAH GITTINGS**;<br>**NATHAN PEET**; and<br>**CARMEN PALMER**,<br><br>      Plaintiffs,<br><br>v.<br><br>**FACEBOOK, Inc**., a U.S. Corporation;<br>**KEVIN MATHEWSON**, in his individual capacity;<br>**KENOSHA GUARD**;<br>**RYAN BALCH**, in his individual capacity;<br>**BOOGALOO BOIS**; and<br>**KYLE RITTENHOUSE**, in his individual capacity,<br><br>      Defendants. | Civil Case No.<br>2:20-cv-1483 |

      **COMES NOW** Attorney Jennifer Sirrine, previously counsel for Plaintiffs, and requests the Honorable Court GRANT this Motion to Withdraw.

      **IN SUPPORT WHEREOF**, she states the following:

      On September 15, 2020, Jason Flores-Williams retained Attorney Sirrine to write the initial complaint filed in this matter. In consideration for severely under-paying for this work, Williams promised Attorney Sirrine that she would become co-counsel in this case, handle the associated press, and receive compensation for further work in this matter.

In an email dated September 21 that outlined the terms of the contract, Williams stated Attorney Sirrine "will be 80 percent in charge of handling the inevitable motions to dismiss as I will be in those two murder trials" and assured her he would be able to pay her fees because, "for the record, know that I am now a rich lawyer."[1]

The complaint was written and filed (before the agreed-upon deadline) in satisfaction of Attorney Sirrine's initial obligation under the contract.[2]

However, it is clear Williams did not understand the actual parameters of the co-counsel relationship, because as soon as Attorney Sirrine began actively participating in the case, the harassing emails began to arrive.

On September 24, after asking Williams how to proceed with tracking the hours completed for the media interviews, he responded by attempting to condescendingly renege on the agreement, informing Attorney Sirrine that: "Going forward, if I decide to use you for an assignment, I will contact you, ask if you're available, then offer it for you to bill." He further instructed her to not do any more media interviews (though he failed to respond when asked if he would like to take over the already-scheduled NPR interview the next morning).

Understanding the importance of a smooth co-counsel relationship, Attorney Sirrine responded politely and offered to write a formal contract that spelled out the terms of the co-counsel relationship. Williams—who at this point was likely already contemplating how to get Attorney Sirrine removed from the case—never signed the co-counsel contract sent by Attorney Sirrine.

---

[1] These terms were orally agreed to by Attorney Sirrine in a phone call that took place on September 17 at 7:56 p.m.
[2] Additionally, the day after the complaint was filed, Attorney Sirrine received a phone call from the law firm representing the parents and estate of Anthony Huber, Plaintiff Gittings's deceased life partner. When she told Williams about this, he instructed her not to return their call because they were "right-wing nutjobs." However, in Attorney Sirrine's opinion, this would have been approaching malpractice, as there are delicate interpersonal dynamics that affect this case. Accordingly, Attorney Sirrine spoke with the law firm a few days later and attempted to negotiate a peaceful resolution, but she was terminated from representation before this could be achieved.

On September 25, Attorney Sirrine was contacted by a credible potential plaintiff who would work well in the case, so she emailed Williams requesting they speak about the possibility. He replied to this business inquiry with: "We need to have a discussion about all of this, Jennifer. You're very talented, but am [sic] not sure that you understand the work required over a career to have access to these sorts of cases along with the knowledge for how to manage them. I was very generous with you." This despite the fact that Williams graduated from law school—with a LL.B. not a J.D.—five years before Attorney Sirrine and did not immediately begin practicing, as he was pursuing a "writing" career.

Williams then requested the two speak over the phone but, having grown concerned at the bizarre and increasingly harassing nature of the emails, Attorney Sirrine requested they keep corresponding over email and asked what specifically (other than the new plaintiff, presumably) he would like to discuss. Williams responded with the following:

> Jennifer,
> First, my name's Jason. It's not co counsel. And it is important that we have the sort of trust where we able [sic] to talk on the phone and have a good relationship.
> I contracted you through [a platform for independent contractors] . . . . I like to value others and treat them like human beings. It's very important to me as a lawyer and a person. You seemed really invested in this project, so I agreed that you could come on as co counsel.
> I wanted to support another passionate young attorney. You did a great job with the complaint. I paid for the filing. I have paid for everything to this point.[3] All of the Plaintiffs retainer agreements are with me and my firm [sic]. No one is doing this for the money. There is a deep trust relationship between the Plaintiffs and my firm--otherwise this case would not exist. As of today, you have never spoken with any of the Plaintiffs.[4]
> The suit, as expected, generated media attention. Normally, I handle it. But as I told you on the phone, I don't like when lawyers involve their egos and demand that they are the only ones who do media. Again, goes back to this duty to support and help train other lawyers. This is a cool and cynical profession. So, I actually

---

[3] "Everything to this point," of course, did not include costs Attorney Sirrine incurred for admission to the Eastern District of Wisconsin, or any of her other fees.
[4] This is factually incorrect, despite Williams's attempts to keep the Plaintiffs' contact information from Attorney Sirrine.

> took time to work with you, share my experiences and what I have learned over the course of my career dealing with media.
>
> We also had an agreement, based upon the fact that I had contracted you, that I would pay you $40 an hour to work on the case. There was no guarantee of work. No set hours. Nothing. When I needed your help, I would pay you for it. At the time, I thought our relationship would be like a lot of relationships that I have with attorneys. We work together, share thoughts, strategize - I wouldn't be charged for every phone call because a lot of this stuff is fun. But then in the middle of being encouraged to do media by me, you write an email asking if you should keep your hours, in other words, that I should pay you to do media. Maybe this was a mistake and I am willing to accept that. But it also set off a lot of red flags that you were thinking this way. Maybe it's just your style. Maybe I overreacted a little bit. It was just deeply unexpected as I thought we were in this together.
>
> Accordingly, let's stop this...call me. Let's talk. Give me a call.

At this juncture, Attorney Sirrine was deeply disturbed by the incoherent nature of the emails and, given Williams's history of substance use,[5] was further concerned they were composed under the influence. She then did the research she *should* have done at the outset, and proceeded to discover facts that led her to believe that Williams is without the legal skill required to properly litigate this type of important, high profile case.[6]

Though he admitted as much in the initial job posting, he almost exclusively practices criminal defense and is without the civil litigation experience necessary to competently prosecute this case. To wit, one of the few civil suits Attorney Sirrine was able to find was a case in which Williams named the Colorado River as a person, which he was then forced to withdraw under the

---

[5] An article from 2012 noted Williams "raged against the literary machine in his now-infamous substance-fueled public readings." He was also a blogger for the marijuana-focused magazine High Times, appeared in the video WEEDIQUETTE, and has participated in pot-activist circles; he can also be found on websites such as weedfinder.com. *See WEED WARRIOR Keith Stroup with Jason Flores-Williams*, The Brooklyn Rail, April 2013, https://brooklynrail.org/2013/04/express/weed-warriorkeith-stroup-with-jason-flores-williams. Additionally, in an interview on Vimeo in which he discusses how sexually graphic his novel is, he can be seen smoking what appears to be a…cigarette…and brandishing a half-empty bottle of tequila. *Found on* https://vimeo.com/115179195. Furthermore, in *Child of War, A Memoir*, Williams notes that his father (who was convicted of drug trafficking) was addicted to cocaine, indicating a family history of substance abuse.

[6] For example, Williams represented a Vietnam veteran who was trying to get his pension reinstated, but the suit was dismissed because Williams failed to first pursue the statutorily-mandated administrative remedy. *Vietnam Vet Loses Suit Against VA to Get Benefits From Cuba*, Boston Globe, Feb 17, 2016, https://www.bostonglobe.com/news/nation/2016/02/17/vietnam-vet-loses-suit-against-get-benefits-cuba/2zSgdNcM5JzSoEnlu2XcGO/story.html

threat of sanctions.[7] In the other, where he represented homeless citizens in a class action suit, the federal judge specifically told Williams what he had to do with regard to litigation strategy (namely, that the individual defendants had qualified immunity and that Williams should only be naming the city as a defendant, and that he needed to severely reduce the number of claims alleged).[8] The judge further advised that he "really needs to find some co-counsel."[9]

It was at this point Attorney Sirrine surmised that her skills were necessary for the non-negligent prosecution of this suit. Having already been in contact with the plaintiffs—despite Williams previously declining to give her their contact information—Attorney Sirrine prepared attorney-client contracts, two of which were signed by Plaintiffs Gittings and Peet. She then filed an amended complaint that corrected an important typographical error in paragraph 31 and added a fifth plaintiff, which she believed to be in the best interests of forwarding the litigation with competent counsel.[10]

She sent an email apprising Williams of the new development and stated she would no longer require him to pay her for her work, hoping it was just the money and not the fame he was concerned with. She further noted that: "Fighting the evil of white supremacy is bigger than either of our egos. I hope we can maintain a cordial, positive relationship going forward."

---

[7] *Attorney to Withdraw Colorado River Suit Under Threat of Sanctions*, Westword, Dec. 4, 2017, http://www.westword.com/news/ colorado-river-lawsuit-to-be-withdrawn-due-to-potential-sanctions-9746311

[8] *Attorney for Homeless Told to Scale Back Lawsuit*, CBS Denver, Oct. 12, 2016, https://denver.cbslocal.com/ 2016/10/12/attorney-for-homeless-told-to-scale-back-lawsuit/

[9] *Homeless plaintiffs suing Denver get class action status, and the judge tells their lawyer to get some help*, Denverite, Apr. 27, 2017, https://denverite.com/2017/04/27/homeless-plaintiffs-suing-denver-get-class-action-status-judge-tells-lawyer-get-help/

[10] However, Attorney Sirrine made a clerical error: she forgot to delete Williams's signature from the amended complaint, as she is accustomed to the standard business practice of all co-counsel attaching their signature to the pleadings. Accordingly, she acknowledged this mistake and offered to strike the offending document; before she could do so, however, Williams had already contacted the plaintiffs, who then terminated their contracts with Attorney Sirrine.

It is at this point the gasket completely exploded in Williams. He initially sent two emails, one of which asked if Attorney Sirrine knew that what she did was "on the record" (to which the answer is yes, obviously); the other one contains language that Attorney Sirrine would prefer not to quote.

In the third email that was over 1500 words long, Williams first proceeded to tell a rambling story about when he was a "young attorney" and an older lawyer advised him to withdraw from a case because the plaintiff he was representing was lying.[11] He then stated he hoped "this misperception [on] your part of a high profile big payday led you to a moment of panic and a severe, but temporary, lapse in judgment." After he detailed the timeline of events that were outlined in the above paragraphs, he proceeded to rely on the misogynistic trope of the "crazy, irrational" woman, stating: "I am going to simply assume that you had some kind of momentary health issue." Then—based on the clerical error Attorney Sirrine was easily able to rectify (which she offered to do in the reply to this unhinged rant)—Williams proceeded to threaten her with professional sanctions if she did not withdraw immediately:

> Now, you will first say that you will not. And then try to find something that you feel like you can say against me, or that your withdrawal would bring some embarrassment that I want to avoid, so that the next two weeks or so will be uncomfortable. And they might be. But I can tell you ultimately that what you will end up doing is digging yourself a bigger hole, because ineluctably, all of the court's and ethics review board's focus will go to the representations you made to the new plaintiff and the pleading to which you falsely affixed another attorney's signature in federal court. I will suffer some embarrassment for not doing my due diligence with regard to allowing you to come on as co counsel. I made a mistake. I trusted and wanted to give you an opportunity. And I am willing to acknowledge this and accept whatever responsibility is necessary to ensure my integrity as an attorney and, probably more importantly, the integrity of this litigation. And I will say exactly this to court and the board along with attaching our communications as evidence, and, of course, the false pleading itself.
> Most attorneys would not do what I am doing here, but ethics rules contemplate Safe Harbor. That an attorney can make a mistake, but then once

---

[11] In retrospect, Williams's tale about failing to do his due diligence was a clear sign that Attorney Sirrine had failed to do hers.

noticed, should be given the opportunity to mitigate it. **This is the notice and the opportunity**. You will not see this right now as generosity, but someday, if you avail yourself of this opportunity and commit to learning from it, you will see this as one of the kindest and most collegial actions an attorney ever took on your behalf. You are at a crossroads. You can say no to safe harbor in the notion that your remaining here in this litigation will cause trouble and discomfort for everyone. And yes, it will for a bit. I will tell the bar and the Court everything that I have said to you in our conversations and emails: that I wanted to give you an opportunity, that I feel like there is a duty to help and train younger lawyers, but that I did not exercise my due diligence with regard to bringing you on as co counsel. I made a mistake. I trusted you. And this will be uncomfortable for this litigation in the short term. You can do that. And we will deal with it. But I advise you in the strongest terms that not to avail of this safe harbor will result in only digging a deeper hole for yourself. **You have a professional responsibility here to admit that you have made a mistake and to take immediate actions to mitigate and correct that mistake. After having been noticed here of a blatant and demonstrable violation, unnecessarily creating problems for this litigation and the Plaintiffs will n** [sic] **result in further sanction. You can do whatever you'd like, but am** [sic] **informing you that the court's and boards analysis will ultimately center on one simple question: did you falsely and impermissibly affix another attorney's signature and then represent that signature to the court on a federal pleading?**

    Moreover, your "21st Century Practice," which you advertise as supporting other attorneys, will come under review by the profession. At the very least, you will be required to inform any potential client that you falsely affixed another attorney's name to a federal pleading in a misrepresentation to a federal court. In actuality, you will likely be suspended with this action being registered against you in every bar in which you are licensed while having to disclose it to every bar in which you attempt to be reinstated and licensed in the future.

    Here are the necessary steps to avail yourself of this safe harbor:

    1) Contact the new Plaintiff and without making misrepresentations, inform that she needs to speak with me immediately. Without making any representations, I will endeavor to represent to her in a neutral way that you will no longer be apart [sic] of this litigation and that she can remain a plaintiff if she would like to sign an attorney client agreement with my firm and work with us.

    2) Draft a motion for your withdrawal, send it to me for my review, signature and filing.

    3) It is Sunday, but I know that you know what you have done and are receiving these emails. If I don't have a response from you exactly along these lines, then I will wake up tomorrow morning, inform the plaintiffs, submit a complaint to the US Eastern District of Wisconsin and notify the court.

    As I said, Jennifer, you can go into attack mode, but you will only end up doing further damage to yourself. I doubt you will hear me saying this to you, but this profession isn't about dominating the other guy or always being the smartest person in the room, but about how we treat other people. As old fashioned as this will sound, a lawyer is only as good as her word. As you go through the wars and

> battles - and I hope you avail yourself of this opportunity so that you can - you will find that the only thing we have is our integrity.
>     (emphasis in original)

Acknowledging the clerical mistake in her reply, Attorney Sirrine agreed the amended complaint was filed in error and that she would strike the offending pleading, but stated she preferred to stay on as co-counsel. Williams, in a much shorter, one-sentence email, agreed that he would like the complaint "withdrawn."

In yet another error, Attorney Sirrine assumed they could proceed as amicable co-counsel and sent the attorney-client contracts to Williams for his records. Approximately a few hours later, Plaintiffs Gittings and Peet emailed Attorney Sirrine stating they wished to end their attorney-client relationship because of "broken trust"—a set of facts which, incidentally, meet all of the elements of the Colorado claim for tortious interference with business contracts. Attorney Sirrine then conceded to Williams's control over the plaintiffs and offered to withdraw.

She received the following email on October 1:

> Ms. Sirrine:
> Hope you are doing well. I know that you must be very busy, but we have a couple of filings that we were hoping get [sic] on file soon, and didn't want to file anything for which you would be responsible and that didn't [sic] have the opportunity to review.  A gentle request that you file your withdrawal when you have a chance.
> Best,
> JFW

The drastic change in the nature of the emails received over the past several days gives rise to a genuine concern; accordingly, Attorney Sirrine does not feel comfortable proceeding as co-counsel with Williams, particularly given the threats quoted above.

Based on these facts, Attorney Sirrine has sent ethical complaints to the various Bar Disciplinary Boards under which Williams is licensed, including the State Courts of New Mexico, Colorado, as well as the District of Columbia.

**WHEREFORE**, based on the foregoing, the undersigned is assured the Court has been apprised of the clear breakdown of the co-counsel relationship, which Williams then proceeded to use to destroy the attorney-client relationship between Attorney Sirrine and Plaintiffs.

Accordingly, Attorney Sirrine respectfully requests this Honorable Court **GRANT** her Motion to Withdraw.

s/ Jennifer D. Sirrine

Jennifer D. Sirrine
21st Century Law
PO Box 261
Littleton, MA 01451
Reg. No. 706180
978-616-4852
j.d.sirrine@centurylaw.org